UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
        vs.                       :   No. 4:07-CR-00050
                                  :
CHRISTOPHER ROSS                  :   (Judge Muir)

OPINION

MUIR, District Judge

I.  Introduction.

On February 8, 2007, an Indictment consisting of five counts was returned charging Christopher Ross, an inmate at the Allenwood Federal Correctional Complex, White Deer, Pennsylvania, with causing interstate travel in aid of racketeering (Heroin Distribution) in violation of 18 U.S.C. § 1952(a)(3) (Count 1), providing a prohibited object to an inmate in violation of 18 U.S.C. § 1791(a)(1) (Count 2), using a telephone to facilitate drug distribution in violation of 21 U.S.C. § 843(b) (Count 3), distribution of a controlled substance resulting in death in violation of 21 U.S.C. § 841(a)(1)(Count 4) and conspiracy to introduce contraband into the prison in violation of 18 U.S.C. § 371 (Count 5).  The case involves the introduction of heroin into the prison and the death of an inmate as the result of ingesting that heroin.  The maximum penalty which could be imposed on Counts 1 and 5 of the Indictment is imprisonment for 10 years and a $500,000 fine.

On June 18, 2007, Ross entered a plea of guilty to Counts 1 and 5 of the Indictment pursuant to a plea agreement. The plea agreement stated that "[s]ome quantity of the heroin in

question was distributed to inmate Jeremy Lyons who subsequently died from a heroin overdose." In the Statement of Facts filed on June 18, 2007, it was undisputed by Ross that he "arranged for the drug's distribution to many inmates . . . including Lyons directly by himself and through [another inmate]." Doc. 24, Statement of Facts in Support of the Guilty Plea, paragraph 13.

A presentence report was prepared and submitted to the court on September 25, 2007. The Probation Officer determined that the total offense level is 14, the criminal history category is VI and the advisory guideline imprisonment range is 37 to 46 months. In paragraph 62 of the presentence report the Probation Officer stated that an upward departure may be warranted pursuant to U.S.S.G. § 5K2.1 if the court finds that death resulted from the defendant's actions. Ross did not file objections to paragraphs 4 through 16 of the presentence report which outlined the offense conduct. We will adopt those paragraphs as undisputed and include them in our findings of fact set forth below to the extent that they are not covered by the findings of fact submitted by the parties.

A presentence conference was held on September 28, 2007. At that conference the parties suggested that a second presentence conference be scheduled and that in the interim the parties would attempt to determine if a hearing was necessary or whether they could enter into a stipulation regarding the facts. The court scheduled a second presentence conference.

The second presentence conference attended by Assistant

2

United States Attorney Martin, Defense Counsel Smith and Probation Officer Noll was held on November 15, 2007.

At the second presentence conference the court authorized the Government to file a motion for upward departure pursuant to U.S.S.G. §5K2.1 which states in part that "[i]f death resulted, the court may increase the sentence above the authorized guideline range." On November 30, 2007, the Government filed such a motion. Also, at the conference counsel advised the court that there were disputed issues of fact and the court issued an oral order placing the case on the February, 2008, trial list for a presentence hearing. The hearing with respect to that motion was subsequently moved to the April, 2008, trial list and then advanced to March 18 and 19, 2008. The only witness to testify at the presentence hearing was Mark Brown, the cell-mate of Ross. The following are the court's findings of fact, discussion and conclusions of law.

II.  Findings of Fact.

1.  On January 15, 2006, the Unit 2A officer at the Federal Correctional Institution, Allenwood Federal Correctional Complex, responded to the duress button in Cell 109 at approximately 11:39 p.m. (Undisputed, hereinafter "U")

2.  There he observed one inmate experiencing a medical crisis, not breathing and having blood on his face.  (U)

3.  When sufficient staff arrived, they entered the cell and observed closely the ill inmate, Jeremy Lyons, who was found lying on the top bunk and acting unresponsively. See

3

paragraph 4 of the presentence report.

4.   Staff immediately initiated CPR and emergency medical services were activated who took Jeremy Lyons to the front lobby of the facility while staff continued resuscitation attempts. (U)

5.   When EMS personnel arrived on the scene, Lyons was found to be in cardiac arrest and they took the inmate to Evangelical Community Hospital where he was pronounced dead by medical personnel at 12:30 a.m. on January 16, 2006. (U)

6.   Staff closed cell 109, declaring it a crime scene and efforts were undertaken by investigative personnel to interview inmates to determine with whom Lyons earlier that evening had associated as well as how he may have died. (U)

7.   An initial examination of the inmate's body by both outside medical personnel as well as a later forensic pathological examination suggested recent drug usage in light of a fresh track mark on his left arm that had been bleeding as well as previous drug usage as confirmed by old track marks. (U)

8.   A toxicology study revealed that both blood and urine samples tested positive for morphine derivatives which led a forensic pathologist to conclude that the cause of death for 33-year old Lyons was opiate toxicity or overdose from abuse with heroin. (U)

9.   Investigative personnel focused on inmates who recently may have had visits with persons in the community, from whom drugs could have been introduced, as well as telephone calls

with persons in the community which also could have revealed efforts to bring drugs into the institution.  See paragraph 8 of the presentence report.

10.   Inmate interviews in Unit 2A confirmed that Lyons had secured and used heroin the evening of his death, which caused suspicion to fall upon two inmates who lived together in Unit 3B, Mark Brown and Christopher Ross. (U)

11.   On January 15, 2006, Brown received a visit from his girlfriend who lived in Baltimore, Maryland.  When Brown was interviewed by investigators, he admitted receiving a balloon containing heroin from his girlfriend in the visiting room of the prison.  See paragraph 9 of the presentence report.

12.   The balloon containing the heroin was passed to Brown when he kissed his girlfriend.  Brown swallowed the balloon and later regurgitated the balloon after he returned to his cell. Id.

13.   Brown along with Ross divided the heroin and packaged some of the heroin into small pieces of paper.  Brown gave some of the "paper" to Ross and also the heroin that remained in the balloon.[1]

14.   Ross told Brown that he passed some of the heroin to Lyons.  Lyons directly received heroin from Ross.  The heroin was payment for "wine" that Lyons had provided to Ross.[2]

---

[1]This finding of fact is based on the testimony of Mark Brown which we find credible.

[2]Id..

5

15.   A review of telephone calls made by Ross to his girlfriend in January 2006 reveal that Ross engineered the drug introduction scheme.   See paragraph 9 of the presentence report.

16. On January 7, 2006, Ross called his girlfriend, asked her to "hook-up" with Brown's girlfriend, provide her with something and remind her to visit her boyfriend at the facility. See paragraph 10 of the presentence report.

17.   On the following day, during another call, Ross's girlfriend told him that she could not locate the item.   Ross told her not to wash any clothes containing the item and hoped that she would contact Brown's girlfriend.   The item in question apparently was small since Ross also suggested that the item may have been lost under the seat of her car.   Id.

18.   Ross and his girlfriend had a visit on January 8, 2006.   After it, during another call, the girlfriend said that she thoroughly had checked her car for the item. Id.

19.   On January 9, 2006, Ross again called his girlfriend.   Ross' girlfriend said that she had checked her car and warned a young child that the "little balloon" contained "rat poison" and not to touch it.   Again on the following day, Ross called and urged his girlfriend to look closely in the car's seats and referred twice to the losing of it as "serious."   See paragraph 11 of the presentence report.

20.   Later that day, Ross gave his girlfriend the name and telephone number of Brown's girlfriend and said that he would see her on the upcoming weekend.   Id.

6

21.   On January 11, 2006, Ross called a male friend.
He expressed some concern that his girlfriend had lost the item.
On the following day, speaking directly with his girlfriend, Ross
again inquired whether she had found it and urged her to continue
to look for it even though she had done so for "three straight
days."  To explain further the nature of the item, Ross in
response to his girlfriend's statement that it might be right
under her nose, made a joke: "I hope it is and I hope you sniff
it . . . ."   See paragraph 12 of the presentence report

22.   Later, on January 12, 2006, Ross asked whether his
girlfriend had called Brown's girlfriend and urged her to
continue looking for the item.   Id.

23. Ross called his girlfriend on January 13, 2006, and
again inquired about the missing item and asked her to check for
it on the tracks under the car seat.  See paragraph 13 of the
presentence report.

24.   On January 14, 2006, Ross' girlfriend again
visited him.  After that visit he called and alluded to a visit
the next day and also alluded to Brown's girlfriend.  In a second
call that night, Ross urged his girlfriend to contact another
person.  Id.

25.   On the day Brown was visited by his girlfriend,
Ross called his girlfriend at 6:53 a.m.  Ross's girlfriend
confirmed that she was in touch with Brown's girlfriend.  Toll
records for the two women confirmed that they had communicated
with each other on that day and in the preceding days.  See

7

presentence report paragraph 14.

26.   Brown's girlfriend confirmed that on January 15, 2006, she had received from Ross' girlfriend a balloon containing suspected contraband drugs and passed it to Brown later that day when she kissed Brown.   See presentence report paragraph 15.

### III.   Discussion.

Section 5K2.0 of the United States Sentencing Guidelines states in relevant part as follows:

(a) UPWARD DEPARTURES . . . .

*   *   *   *   *   *   *   *   *

(2) DEPARTURES BASED ON CIRCUMSTANCES OF A KIND NOT ADEQUATELY TAKEN INTO CONSIDERATION –

(A) IDENTIFIED CIRCUMSTANCES.– This subpart (Chapter Five, Part K, Subpart 2(Other Grounds for Departure)) identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range (e.g., as a specific offense characteristic or other adjustment).  If any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart may be warranted.

One of the circumstances identified in Chapter Five, Part K, Subpart 2, which the commission did not take into consideration in determining the applicable guideline range in the present case is death of an individual.  Section 5K2.1 allows the court to depart where death results as a result of the offense of conviction and states in toto as follows:

Death (Policy Statement)

8

> If death resulted, the court may increase the sentence
> above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence
> at or near the statutory maximum.  The sentencing judge
> must give consideration to matters that would normally
> distinguish among the levels of homicide, such as the
> defendant's state of mind and the degree of planning or
> preparation.  Other appropriate factors are whether
> multiple deaths resulted, and the means by which life
> was taken.  The extent of the increase should depend on
> the dangerousness of the defendant's conduct, the
> extent to which death or serious injury was intended
> or knowingly risked, and the extent to which the
> offense level for the offense of conviction, as
> determined by the other Chapter Two guidelines, already
> reflects the risk of personal injury.  For example, a
> substantial increase may be appropriate if the death
> was intended or knowingly risked or if the underlying
> offense was one for which base offense levels do not
> reflect an allowance for the risk of personal injury,
> such as fraud.

Several cases demonstrate that for this section to be applicable,

the prosecution need prove only that the defendant was a drug

dealer who distributed drugs and that an individual died as a

result of using the drugs.  See, e.g., United States v. Pancheo,

489 F.3d 40 (1st Cir. 2007); United States v. Robinson, 167 F.3d

824 (3d Cir. 1999); United States v. Ihegworo, 959 F.2d 26 (5th

Cir. 1992).  It is not a requirement that the defendant be the

sole or direct cause of the death, only that there be a causal

connection between the defendant's conduct and the overdose

death.  Id.

Based on the findings of fact set forth in Part II of

this opinion, it is clear that the death of Lyons occurred as the

direct result of Ross' conduct.  Ross organized the scheme to

bring heroin into the prison and directly provided heroin to

Lyons who died of an overdose of that drug.   We will grant the
Government's motion for an upward departure.

We will now address the extent of the departure. In
determining the extent of a departure, the Court of Appeals for
this circuit has suggested that sentencing courts look to
analogous sentencing guideline provisions.  United States v.
Baird, 109 F.3d 856, 872 (3d Cir. 1997).  In Baird the Court of
Appeals concluded that in certain cases provisions of the
guidelines themselves may suggest an analogy from which to
determine the appropriate level of departure.  The Court of
Appeals also stated that "our review of the sentencing court's
decision in this regard is deferential."  Id.

Ross entered a plea of guilty to causing interstate
travel in aid of racketeering and conspiracy.  The base offense
level of 12 for those offenses was calculated using the
underlying substantive offense of distributing less than 5 grams
of heroin.  U.S.S.G. § 2D1.1(c)(14).  Under 21 U.S.C. §
841(b)(1)©, a person found to have distributed less than 5 gram
of heroin which resulted in the death of an individual would
receive a base offense level of 38 under the Sentencing
Guidelines.  U.S.S.G. § 2D1.1(a)(2).  The difference between the
base offense level for mere distribution of less than 5 grams of
heroin and distribution of heroin which results in the death of
an individual is 26 levels.  Although Ross was not convicted of
distribution of heroin under 21 U.S.C. §841, the Sentencing
Guidelines suggest that we should impose a substantial upward

10

departure in this case.   Also, a substantial upward departure is
warranted because the Sentencing Guidelines relating to Ross'
offenses of conviction (causing interstate travel in aid of
racketeering and conspiracy) do not take into consideration the
risk of personal injury.   Although no evidence was presented
indicating that the death was intended, it is safe to conclude
that it was "knowingly risked."

        Under the guidelines the base offense level for Ross'
offenses of conviction is 12 and his total offense level with the
application of the career offender provision is 14.   It is clear
that the Sentencing Commission was of the opinion that when death
results there should be a substantial increase in the offense
level.   However, a departure of 26 levels (the difference between
the base offense level for mere distribution of less than 5 grams
of heroin and the base offense level for distribution resulting
in death) from a total offense level of 14 to a total offense
level of 40 is clearly extreme and unwarranted.   In a similar
situation, the Court of Appeals for the Fifth Circuit affirmed an
8-level departure. United States v. Ihegworo, 959 F.2d at 28 n.2.
An 8-level departure will result in a total offense level of 22
and advisory guideline imprisonment range of 7 years to 8 year
and 9 months.   The most this court could impose in this case
would be the statutory maximum of five years on each count to be
served consecutively, that is, a total sentence of 10 years'
imprisonment.

        Under the circumstance of this case we will depart

11

upwards 8 levels.

IV.   Conclusions of Law.

1.   The Government has proved by a preponderance of the evidence that the death of inmate Jeremy Lyons resulted from the ingestion of heroin Lyons received directly from Ross.

2.   An upward departure of 8 levels is warranted in this case pursuant to U.S.S.G. § 5K2.1.

An appropriate order will be entered.

s/Malcolm Muir
MUIR, U.S. District Judge

Date: March 25, 2008
MM:gs

12

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                             :
        vs.                  :   No. 4:07-CR-00050
                             :
CHRISTOPHER ROSS             :   (Judge Muir)


ORDER

March 25, 2008


        Within 20 days of the date hereof, Defendant shall file
a brief addressing the section 3553(a) factors.  Subsequent
briefing shall be in accordance with the Local Rules of Court.




                              s/Malcolm Muir
                              MUIR, U.S. District Judge

MM:gs